**ADC TELECOMMUNICATIONS, INC., Plaintiff,**

**v.**

**SIECOR CORPORATION, Defendant.**

**Civil Action No. 95–813 MMS.**

United States District Court, D. Delaware.

Argued Dec. 6, 1996.

Decided Feb. 7, 1997.

William J. Marsden, and Joanne Ceballos, of Potter Anderson & Corroon, Wilmington, Delaware; of counsel: Douglas J. Williams, Timothy A. Lindquist, and Steven J. Pollinger, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minnesota, for plaintiff.

Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; of counsel: C. Joseph Laughon, II, and Kevin J. Arquit, of Rogers & Wells, New York City, for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

This action arises out of Siecor Corp.'s ("Siecor") alleged infringement of ADC Telecommunications, Inc.'s ("ADC") U.S. Patent No. 5,363,465 ("the '465 patent") purportedly covering new telecommunications technology which made fiber-optic management and storage components "idiot-proof." The '465 patent was issued on November 8, 1994 and ADC filed suit for infringement shortly after Christmas in 1995. Discovery is now complete and Siecor has filed a motion for summary judgment. Jurisdiction is founded upon 28 U.S.C. § 1338(a). For the reasons below, Siecor's motion will be denied.

### II. FACTUAL BACKGROUND

#### A. Modules and the '465 Patent

The '465 patent is directed generally at fiber optic management and storage components; specifically, the patent is entitled "Fiber Optic Connector Module." Docket Item ("D.I.") 55 at 105.[1] Modules are used in the

---

1. Due to a convention adopted by the parties at the earliest stage of this litigation, the nomenclature involved in this technology is lamentably confusing, requiring the Court to don the sorcerer's miter, wave its word processor, and traffick in the dark art of semantic necromancy. What the '465 patent describes as a "cartridge" is not the type of cartridge referenced by the parties or the Court in its recitation of the factual background. Rather, when the '465 patent refers to a "cartridge," it signifies what the parties have agreed to call a "module" or a "VAM module." In a similarly murky vein, when the '465 patent

telecommunications industry; they are generally manufactured by companies like Siecor and ADC and bought by, among others, long-distance carriers. *Id.* at 111, col. 1, ln. 10–11. The modules at issue in this case are rectangular devices approximately eight inches long, six inches wide, and an inch high. They slide into a larger cabinet-like framework, referred to as a chassis. The chassis involved in this litigation is approximately twenty inches long, and stands about seven and one-half inches high. It has two columns of slots, into which the modules are fitted. Hooks run down each of the left and right edges of the chassis framework.

Angled connectors are attached to the front end of each module. The angled connectors are aptly named; they are short, hollow protuberances which point to either the right or left side of the module. Once the modules are inserted into the slots of the chassis, fiber optic cables wind through the angled connectors of the module and through the hooks on one side of the chassis. *Id.* at ln. 11–14.

As the telecommunications industry grew, the use of fiber optics increased. Problems with the chassis arose. As noted earlier, the fiber optic cables had to wind through the angled connectors of the module, then through the hooks of the chassis. Assume a customer, understandably vexed at the tangle of fiber-optic cables confronting him, inserted a module upside down into a two-column chassis. Then the cables would snake out of the angled connectors pointed toward one side (say, the left side of the module), and follow a sharp angle through the hooks located on the other side of the chassis (say, the right side). If inserted this way and connected correctly, the cables would still work. But the contortions of the cables would often sap the signal strength

and cause the cables to weaken and eventually break. *Id.* at ln. 15–30.

Further, the number of necessary connections soon outpaced the technical dexterity and patience of customers. Mismatched cables and wires led to the malfunction of equipment. To combat this problem, the industry developed cartridges. Cable connections were aligned in cartridges. Several cartridges were placed in one module. The module, in turn, was fitted into a slot of a chassis. But further compartmentalization did not remedy all of the industry's problems with the chassis. Unless the modules were inserted correctly into the chassis, an unwary customer would soon find itself confronted by the myriad evils discussed earlier—missed connections, broken cables, and faulty equipment. *Id.* at ln. 30–40.

ADC recognized these difficulties and sought to cure them with the technology of the '465 patent. ADC invented a module—dubbed the Value Added Module ("VAM" or "VAM module")—which was configured so that it could *only* be inserted correctly; that is, so the angled connectors of the module were pointed toward the hooks on the appropriate side of the chassis. ADC accomplished this by making the overhanging edges of the module asymmetrical; it attached a top cover to the module which extends further over one side of the module than the other. Specifically, one flange extends approximately ⅝ of an inch over the body of the module while the other flange extends only approximately ¼ of an inch over the module. The slots in the chassis are made to accommodate the unequal flanges, making it impossible to insert the module into the chassis unless the respective flanges fit the appropriate chassis slot. For the angled connectors to face the hooks on the

refers to a "fiber optic module," it specifies what the parties have chosen to call a "chassis."

In sum, in the universe of this opinion, (1) a "cartridge" as used in the '465 patent will be considered a "module" or a "VAM module," and (2) a "module" as used in the '465 patent will be referred to as a "chassis." Mercifully, what the parties, in their convention, call a "cartridge" has no counterpart in the '465 patent.

This nomenclature will present thorny obstacles to a quick, comprehensible jury presenta-

tion. Nevertheless, since all of discovery has been conducted using the terminology described above, the Court has no choice but to acquiesce. Thus, for purposes of this opinion, "Fair is foul, and foul is fair, . . ." WILLIAM SHAKESPEARE, MACBETH act 1, sc. 1, and "nothing is [b]ut what is not[,]" *id.* at act 1, sc. 3. Counsel are alerted the Court has tentatively concluded a jury should not be subjected to the confusion wrought by the adoption of a confusing convention.

closest side of the chassis, the module can simply be fitted into the slots of the chassis. For the angled connectors to lead toward the hooks on the far side of the chassis, the module must be inverted. If the module is not inverted, it will not fit into the chassis. Thus, the designs of the module and the chassis ensure the angled connectors of the module are always aligned toward the appropriate hooks of the chassis.

The '465 patent has ten claims. Both parties differ over the scope and meaning of four of those claims. ADC contends the first six claims are directed to the module-chassis combination and the last four claims pertain solely to the module. Siecor, on the other hand, argues that all claims of the '465 patent are combination claims covering the module and the two-column chassis. This issue will be more fully explored in the discussion of Siecor's claim of noninfringement.

## B. Sprint Enters the Picture & The Bidding War Begins

In December of 1994, MCI, one of ADC's customers, asked Siecor if it could supply modules to fit an ADC chassis.[2] Jeff Grissom, Siecor's Product Manager for Optical Hardware, and Joe Dodd, a Siecor engineer, obtained an ADC chassis and assorted ADC VAM literature. Dodd reviewed this information, as well as a demonstration sample of an ADC module, and sketched a module that would fit an ADC chassis. Siecor asserts there was no indication of any patent or potential patent on the demonstration sample—either the module or the chassis. Indeed, ADC did not order marking of the chassis until December 1995, just prior to this litigation.[3] D.I. 50 at Exh. B, pp. 14–16. Among the ADC sales literature, a January

1995 sales catalog contained information on an unrelated ADC module patent, U.S. Patent No. 5,123,219 ("the '219 patent"), but not the '465 patent.[4] D.I. 51 at Exh. F, p. 53. Thus, Siecor produced a self-described ADC module "clone,"[5] D.I. 55 at 141, but alleges it had no idea such a clone would violate any ADC patents.[6]

ADC sells its patented modules to, among others, Sprint Long Distance Division ("Sprint"). Until September of 1995, ADC sold modules to Sprint at a price of $708.40 per module—a discount of 30% intended to foster a mutually beneficial, if not exclusive, business relationship between ADC and Sprint. D.I. 55 at 28. Around that same time—September of 1995—Siecor tried to siphon off some of ADC's business with Sprint. Siecor made and delivered at least two modules, so-called "ADC VAM module clone[s]", D.I. 55 at 141, to Sprint and offered Sprint 1,500 modules at a price of $610 per module—nearly $100 less per module than ADC's offer. D.I. 55 at 141–42. On September 29, 1995, Siecor lowered its offer even further, to $595 per module. D.I. 55 at 142. Excerpts from an internal Siecor memorandum, authored by a sales representative, vividly reveal the method to this price-slashing madness: "My gut feeling is that we [Siecor] will attract much attention with our pricing, and perhaps win 50% of the order. ADC will in turn likely lower their price when they get wind of our pricing levels and the erosion of their business." D.I. 55 at 141.

ADC quickly learned of Siecor's designs. Steve Smythe, an ADC sales representative, was visiting Sprint's offices in the "late summer, early fall" of 1995. D.I. 55 at 19. While he was at Sprint, Smythe observed a Siecor module—the "ADC VAM clone"—on

---

2. MCI is a minor player in this patent drama; from this point on, MCI plays no significant role in the events giving rise to this opinion.

3. If the module lacked any patent marking it may be because it had been manufactured before the '465 patent had issued.

4. ADC has acknowledged Siecor has not infringed the '219 patent.

5. Siecor has explained it used the term "clone" to signify its module's compatibility with an ADC chassis. See D.I. 50 at Exh. B, p. 60. It insists it

did not refer to its module as a "clone" in the sense that it was an exact duplicate of the ADC module. See id. at 61. The Court does not refer to this first production of a module by Siecor as a "clone" in any pejorative sense; it is simply helpful in distinguishing the module shown by Siecor to Sprint from Siecor's later redesigned modules.

6. In its brief, Siecor concedes this first module design was covered by one or more claims of the '465 patent. D.I. 49 at 1, n. 1.

display. D.I. 55 at 19, 23, 31, 33. Smythe was also informed by a Sprint engineer that Siecor had vowed to match or beat ADC's module prices. D.I. 55 at 13–14.

At about the same time, Siecor obtained an October 1995 ADC catalog advertising all of ADC's fiber optic products, including the modules at issue in this suit. As with its January 1995 catalog, the October catalog listed the '219 patent as the only patent applicable to ADC's module products. D.I. 51 at Exh. F, p. 46. This further bolstered Siecor's belief, it asserts, that no patents covered the "clone" they had produced.

ADC was not content to fiddle idly, however, while its deal with Sprint burned. ADC notified Sprint that ADC would drop its price to $595 to match Siecor's price. D.I. 55 at 96. On November 3, 1995, Sprint issued invitations for bids—called Requests for Quotation ("RFQ") in the industry—on 1500 modules for delivery by the close of 1995. D.I. 55 at 146. The endgame dictated desperate tactics. ADC knew Siecor would bid on the RFQ, and knew Siecor would lower the price it had previously quoted to Sprint—$595. D.I. 55 at 30. What ADC did not know, however, was how low Siecor was willing to go. Accordingly, ADC gambled on a preemptive strike: it submitted a bid on November 10, 1996, offering Sprint modules for $529 each. D.I. 55 at 192.

Meanwhile, after it received the RFQ on November 3, Siecor concluded it would have to obtain component parts from third parties in order to fill a Sprint order. Siecor issued purchase orders for the component parts from two distributors, Anixter and Graybar. The distributors promptly turned around and ordered the component parts from ADC. D.I. 50 at Exh. C, pp. 17–21. On November 6, ADC sent warning letters to both Anixter and Graybar, informing them of the '465 patent and enclosing a copy of the patent. D.I. 50 at Exh. C, p. 60. Although ADC did not send a warning letter to Siecor, Graybar sent Siecor a copy of the letter. D.I. 50 at Exh. B, p. 107.

When it received Graybar's letter, Siecor's patent counsel reviewed the '465 patent. Siecor's patent counsel concluded the fundamental concept common to all claims of the '465 patent was inversion of the module as a result of its asymmetrical edges. Thus, patent counsel concluded, a module with symmetrical overhanging plates did not require inversion, and would not infringe the '465 patent. Accordingly, patent counsel directed all future Siecor modules be produced with symmetrical overhanging plates that would not require inversion; by the next week, the recommended changes were incorporated into the module design drawings.

Siecor submitted its bid on November 10, 1996, three days before it had redesigned its module to circumvent the claims in the '465 patent.[7] D.I. 55 at 194. As ADC expected, Siecor lowered its price, but only to $585 per module. D.I. 55 at 204, 208. When Siecor discovered it had been outmaneuvered, it lowered its price yet again—this time, to $525 per module, or $4 less than ADC's offer.

A third company, North Supply, also received the RFQ from Sprint. North Supply is a distributor of ADC products; it generally resells ADC products at a 12.5% mark-up. North Supply submitted a bid to Sprint offering to resell ADC modules at $584.53.

On December 13, 1995, Sprint issued formal purchase orders to ADC for 1894 modules at $529 each and to Siecor for 600 modules at $525 each. North Supply was shut out of the sale. Siecor decided it could not manufacture 600 modules by the end of the year, and informed Sprint of this. Accordingly, Sprint canceled its purchase order two days after it had been issued.

On December 28, 1995, ADC filed this suit against Siecor, alleging infringement of its '465 patent. Siecor answered and, after discovery was completed, filed a motion for summary judgment. D.I. 48. Siecor advances four main arguments in support of its motion. First, ADC should be equitably estopped from suing Siecor, Siecor asserts, because ADC intentionally refrained from providing Siecor with a timely warning of the

---

7. Sometime later, Siecor redesigned its module a second time. This second redesign is not at issue in this suit.

'465 patent. Second, once Siecor found out it was infringing the '465 patent, it points out, it promptly redesigned the module. Siecor seeks a declaration that its redesigned module does not infringe. Third, Siecor argues ADC is barred from relief because it failed to comply with the notice and marking provisions of 35 U.S.C. § 287 ("the marking statute"). Finally, Siecor reasons it is impossible to hold it liable for willful infringement of a patent of which it was utterly unaware. For all of these reasons, Siecor argues, this is just a meritless case clogging up the Court's docket. The Court addresses each of Siecor's arguments, and explains why it concludes that—at least at this stage—disposition on summary judgment is unwarranted.

## III. LEGAL ANALYSIS

### A. Standard of Review—Summary Judgment

The controlling standards of review pertaining to a motion for summary judgment are quite plain. Summary judgment is warranted only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Further, a court must view the evidence in a light most favorable to the non-movant, which includes drawing all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). These standards apply equally to patent litigation. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984). With these guidelines in mind, the Court turns to the merits of Siecor's arguments.

### B. Equitable Estoppel

■ In its brief, Siecor raises, apparently for the first time, the defense of equitable estoppel. The abridged version of Siecor's argument is this: through its conduct and silence, ADC led Siecor to believe it was not infringing the '465 patent. But Siecor did not plead equitable estoppel as a defense in its answer. D.I. 55 at 232–36.[8] Rule 8(c) of the Federal Rules of Civil Procedure clearly states: "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... estoppel ... and any other matter constituting an avoidance or affirmative defense." ADC points out that estoppel is largely a factual determination, *see, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042–43 (Fed.Cir.1992), and because Siecor first raised its estoppel defense in its brief, ADC has been deprived of any worthwhile opportunity to conduct discovery into the factual background of Siecor's estoppel claim. Thus, ADC argues, the Court should not consider Siecor's arguments regarding equitable estoppel. *Cf. Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1374 (3d Cir.1993) (allowing unpled affirmative defense when opposing party did not claim prejudice); *Lasseigne v. Nigerian Gulf Oil Co.*, 397 F.Supp. 465, 476 (D.Del.1975) (similar holding).

Siecor points to several instances during discovery in which it asserts ADC should hardly have been shocked when the words "equitable estoppel" were first voiced in connection with this motion. The first item which Siecor contends put ADC on notice was the Rule 26(a) disclosure statement Siecor gave to ADC. In the disclosure statement, Siecor identified Jeff Grissom, Siecor's Product Manager, as a person with "knowledge of Siecor's investigation of and reliance on ADC's false marking of its '219 switch polishing method patent marked in ADC's VAM catalogues." D.I. 59 at Exh. N, p. 2.

Next, Siecor points to a request for admission sent to ADC. The request asked ADC to admit it "has no evidence to contradict that in Siecor's design, development, manufacture, use or offer for sale of its HCMs and/or bays, Siecor believed that the '219 patent has no applicability to its HCM's and bays." D.I. 51 at Exh. E, p. 45. ADC objected to this request on relevancy grounds, explaining "the '219 patent is not at issue in this case." *Id.*

---

8. Siecor did claim in its answer that ADC should be estopped because of actions and statements made to the United States Patent and Trademark Office. D.I. 55 at 234. Those allegations are not implicated in this motion, however.

Finally, Siecor contends that ADC commenced its own discovery regarding estoppel. Siecor posits one brief exchange—actually, three questions posed to Grissom, Siecor's Rule 30(b)(6) witness—as an example of such discovery. The exchange developed as follows:

Q: Was there any determination made as to whether or not [the '219] patent had anything to do with the HCM that Siecor was going to construct?

A: Yes.

Q: What was the result of that determination?

A: The determination was that there was nothing relevant in that patent to the product that we were looking to design.

Q: Did Siecor rely on that conclusion before it proceeded with its design of the HCM that was ultimately going to be shown to Sprint?

A: Yes.

D.I. 50 at Exh. B, p. 71. From the cursory role played by Mr. Grissom so far in this case, Siecor asks this Court to find that estoppel issues have been subject to discovery and tried with the "implied consent" of ADC. D.I. 58 at 7 (citing FED.R.CIV.P. 15(b)). Siecor also vows to file a motion to amend formally its answer to include the affirmative defense of equitable estoppel. *Id.*

Any determination on the merits of Siecor's equitable estoppel defense must await the disposition of its motion to amend. The Court has serious misgivings in extrapolating ADC's knowledge and implied consent of the estoppel defense from the ambiguous passages cited above and the apparent dearth of discovery conducted by ADC on the issue. Indeed, from the excerpts of discovery reproduced above, the Court is almost compelled to an opposite conclusion: that ADC indeed had little knowledge it would be facing an estoppel defense at trial, or in a summary judgment motion. Such a finding must await, of course, the filing and briefing of a motion to amend Siecor's answer. At this stage at least, equitable estoppel does not provide a basis for summary judgment.

### C. Claim Construction of the '465 Patent—Is it necessary?

#### 1. The First Redesigned Module

Siecor asks for an interpretation of the '465 patent as it applies to features of its first redesigned module. Both parties have expended considerable amounts of time and money in deriving such an interpretation, and ADC never gratuitously conceded the first redesigned module does not infringe the '465 patent.

But Siecor entices this Court to tread where it need not. Siecor never showed the first redesigned module to Sprint, and Siecor has developed and manufactured a second redesigned module to supplant its first redesign. ADC has represented it will not maintain the first redesigned module infringed the '465 patent in this action if Siecor offers the first redesign as a defense to willful infringement. Thus, the validity of the first redesigned module is not properly before this Court.

#### 2. The ADC VAM Module "Clone"

[2] Anticipating this view, Siecor urges a limited construction of the '465 patent is still relevant and necessary for determining whether its "clone" infringes. As Siecor points out, it has *not* conceded its "clone" module infringes the '465 patent. Rather, it admits merely that one or more claims of the '465 patent read on that module. In Siecor's view, all claims of the '465 patent are combination claims; that is, each claim requires both a module and a chassis. Such a construction would have two practical ramifications:

(1) Siecor's manufacture of the module alone would not infringe the '465 patent. Significantly, ADC is only claiming injury due to the display of a Siecor module "clone" to Sprint, not from Siecor's manufacture of the chassis. D.I. 54 at 7, n. 1.

(2) If all claims of the '465 patent are combination claims, Siecor asserts, then ADC has not complied with the requirements of the marking statute, 35 U.S.C. § 287. ADC admittedly had marked only the module when Siecor showed its "clone" to Sprint; ADC did not issue an Engineering Change

Order ("ECO") to mark the chassis until two months after Sprint had accepted a bid. According to Siecor, the marking statute renders this neglect fatal. As Siecor reads the marking statute, every element of a patented combination must be marked. Since ADC did not mark the chassis prior to the alleged act of infringement, Siecor contends, ADC is barred from relief.

These two ramifications demonstrate claim construction of the '465 patent is necessary to determine whether all claims are combination claims.

### D. Construction of Claims 7–10 of the '465 Patent

#### 1. The General Principles of Claim Construction

Both parties agree that claims 1–6 of the '465 patent are combination claims. The interpretation of claims 7–10 is the crucible of their dispute: ADC asserts they are directed to a module only, while Siecor views them as module/chassis combination claims.

A two-step process is used to analyze patent infringement claims. First, the asserted claims must be properly construed to determine their meaning and scope, and second, there must be a determination as to whether the claims as construed encompass the accused product. *Insituform Tech., Inc., v. Cat Contracting, Inc.,* 99 F.3d 1098, 1105 (Fed.Cir.1996); *Engel Indus., Inc. v. Lockformer Co.,* 96 F.3d 1398, 1403 (Fed.Cir.1996); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82 (Fed.Cir.1996). The first step, claim construction, is within the province of the Court. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,* 98 F.3d 1563, 1572 (Fed.Cir.1996).

In engaging in claim construction, the Court has been instructed "to look first to the intrinsic evidence of record, namely the language of the claim, the specification and the prosecution history." *Insituform,* 99 F.3d at 1105; *Vitronics Corp.,* 90 F.3d at 1582. The Federal Circuit Court of Appeals has placed particular emphasis on intrinsic evidence, describing it as "the most signifi-

cant source of the legally operative meaning of disputed claim language." *Vitronics,* 90 F.3d at 1582.

The Federal Circuit has gone further and outlined a hierarchical method of evaluating intrinsic evidence. First, a court is commanded to "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Id.* Second, a court must review the patent specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Id.* The Federal Circuit clearly favors use of the specification in claim construction; the specification has been described as "always highly relevant" and "the single best guide to the meaning of a disputed term." *Id.* Third, the court can consider any prosecution history in evidence; it is "often of critical significance in determining the meaning of the claims." *Id.; York Prods., Inc., v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1574 (Fed.Cir.1996).

The court may rely on extrinsic evidence only if the intrinsic evidence does not settle all ambiguity in a disputed claim term. *Vitronics,* 90 F.3d at 1583; *Insituform,* 99 F.3d at 1106 n. 7. The negative corollary to this is obvious: if the intrinsic evidence "unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Vitronics,* 90 F.3d at 1583; *Insituform,* 99 F.3d at 1105.

With the foregoing principles in mind, the Court turns to the construction of claims 7–10 of the '465 patent.[9]

#### 2. Intrinsic Evidence
##### (A) Patent Claims

This case requires exacting inquiry into a particular aspect of the specification—the claim preamble. Siecor argues the preamble of claim 7 operates as a structural limitation. Forests have gone to the blade in pursuit of the ever elusive hard-and-fast rule of when and to what extent a preamble limits the scope of the claim in which it appears. *See Bell Communications Research, Inc. v.*

---

**9.** Since claims 8–10 are dependent from claim 7 and will be defined as either a combination or module-only according to claim 7, the Court only analyzes claim 7.

*Vitalink Communications, Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995) (citing prolific academic commentary). In a recent case, the Federal Circuit elucidated a maxim of preamble interpretation—that is, "a claim preamble has the import that the claim as a whole suggests it." *Id.* at 620. To elaborate, since "no litmus test exists as to what effect should be accorded to words contained in a preamble, review of a patent in its entirety should be made to determine whether the inventors intended such language to represent an additional structural limitation or mere introductory language." *In re Paulsen*, 30 F.3d 1475, 1479 (Fed.Cir.1994).

While these pithy pronouncements may "merely state the problem rather than lead one to the answer[,]" *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989), this is by no means inadvertent. The Federal Circuit has merely reaffirmed that a claim preamble "presents no deeper mystery" and should be interpreted in no different manner than the claim itself. *Bell Communications*, 55 F.3d at 621; *see also Applied Materials, Inc.*, 98 F.3d at 1572–73 ("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history."). Not surprisingly, ADC and Siecor have diametrically opposed opinions as to the effect of the preamble language of claim 7.

Construction of the claim and the preamble begins with the claim itself. *Vitronics*, 90 F.3d at 1582. Claim 7 describes: [10]

A telecommunications cartridge for inserting into a fiber optic module having a cabinet with an interior accessible through an opening and including a frame defining a first column of spaces and a second column of spaces, a first plurality of frame guides disposed on a first side of said spaces of said first column and on a second side of said spaces of said second column, a second plurality of frame guides disposed on a second side of said spaces of said first column and on a first side of said spaces of said second column, *said cartridge comprising:*

a housing having a predetermined size so as to be received by any one of said spaces; ...

a size and disposition so as to slidably mate with any one of said frame guides of said first plurality of frame guides; and

a second cartridge guide disposed on a second side of said cartridge, said second cartridge guide having a size and disposition so as to slidably mate with any one of said frame guides of said second plurality of frame guides

whereby said cartridge is slidable into any one of said spaces of said first column in a first orientation and slidable into any one of said spaces of said second column in a second orientation.

D.I. 50 at Exh. A, p. 9, col. 5–6, ln. 32–35, 1–26. ADC stresses the phrase "said cartridge comprising." It is clear, ADC reasons, that the language following the word "comprising" describes the cartridge; thus, the claim is directed only to a module.

But the chassis is described in great detail in the preamble of claim 7, Siecor notes, and the body of the claim continually refers to "said" components of the chassis described in the preamble. In fact, at least nine times, claim 7 incorporates by reference the description in the preamble of a two-column frame which has a "said first" column of spaces, and a "said second" column of spaces, for receiving a cartridge. In *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 621 (Fed.Cir. 1995), the Federal Circuit Court of Appeals held a claim—covering a telecommunications "method"—was limited by a definition of one of the claim elements—a "packet"—in the preamble. In *Bell Communications*, Siecor points out, the body of the claim repeatedly referred to the "said packet" as defined in the preamble. 55 F.3d at 621. Claim 7 of

---

10. A brief recap: the "cartridge" in the '465 patent is considered a "module" or a "VAM" module by the parties, and a "module" in the '465 patent describes what the parties, and as consequence, the Court, have referenced as a "chassis." *See supra* note 1. The frame to which the patent refers is the interior columnar structure of the chassis.

the '465 patent also repeatedly refers to "said" parts of the chassis, as described in the preamble. Therefore, this case is like *Bell Communications*, asserts Siecor; the claim drafter used both the preamble and the body to define claim 7—the combination of a cartridge which fits into a specific housing frame.

But a claim's mere repetition of a "said" item first described in the preamble does not have the talismanic effect Siecor would accord it. There is a significant distinction between the limitation of the claim in *Bell Communications* and the way claim 7 is affected by its preamble. Claim 6 of a patent was at issue in *Bell Communications*;[11] the preamble recited a "method for transmitting a packet over a system comprising a plurality of networks ... said packet including a source address and destination address[.]" *Id.* at 618. Claim 6 then recited the steps of "assigning, by said source device, one of said trees to broadcast said packet and associating with said packet an identifier indicative of said one of said trees." *Id.* at 621. The patent holder tried to dissuade the court from according "definitional status" to the phrase "said packet including a source address and a destination address" because it appeared in the preamble; instead, the holder argued for a broader definition of "packet" in the claim. *Id.* at 621. The court disagreed, reasoning claim 6 "is plainly limited such that it literally reads only on methods that transmit packets having both source and destination addresses." *Id.* at 621.

Thus, in *Bell Communications*, the preamble clearly defined an element—the "packet"—of the claim—the "method of transmitting" that packet. *Accord In re Paulsen*, 30 F.3d 1475, 1478–79 (Fed.Cir.1994) (limiting

claim of hinged lid to computer because computer is described in preamble); *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed.Cir.1991) (limiting claim used to hang clothes in travel bags because "shank is defined in the preamble as that portion of the hanger 'between the supporting hook for the hanger and the support for the garment[,]' ... a limitation supported by structure which must be satisfied by Samsonite's clamp, either literally or equivalently if infringement is to be found."); *Corning Glass Works*, 868 F.2d at 1256–57 (imputing structural limitation to optical waveguide claim because preamble words define an optical waveguide as allowing "only preselected modes of light to propagate along the fiber.").

The preamble of claim 7, on the other hand, does not define the chassis as an element of the module. Rather, it plainly describes a "telecommunications [module] *for inserting into* a fiber optic [chassis]" with certain characteristics. D.I. 50 at Exh. A, p. 9, col. 5, ln. 32–33. The claim then goes on to describe the structure of the *module*, and describes that structure by reference to the environment in which the module fits. For instance, claim 7 recites "a first [module] guide disposed on a first side of said [module], said first [module] guide having a size and disposition so as to slidably mate with any one of said [chassis] frame guides of said first plurality of [chassis] frame guides[.]" *Id.* at col. 6, ln. 13–16. As claim 6 in *Bell Communications* recited a method that only transmitted a certain packet, claim 7 of the '465 patent recites a module that is made to fit in a particular chassis. Thus, while the preamble of claim 7 states a structural limitation, it is a limitation only on the module.

---

11. Claim 6 read, in its entirety:

A *method for transmitting a packet* over a system comprising a plurality of networks interconnected by gateways, said packet originated by a source device connected to one of said networks and destined for a destination device connected to one of said networks, *said packet including a source address and a destination address,* and said method comprising the steps of defining an undirected graph representative of the system wherein said networks comprise graph nodes and said gateway[s] comprise graph paths, defining a spanning tree on said

graph such that every pair of said nodes is connected by only one of said paths and selecting a plurality of spanning trees for said graph according to pre-determined system guidelines,

*assigning, by said source device, one of said trees to broadcast said packet and associating with said packet an identifier indicative of said one of said trees,*

*Bell Communications*, 55 F.3d at 618 (emphasis added).

The Court knows of nothing in the patent statute or the caselaw which would prohibit patenting both a novel component and a combination utilizing that component. Such a component is precisely what claim 7 recites—an asymmetrical module. Accordingly, although it defines a module by reference to a chassis, claim 7 does not recite a module/chassis combination claim.[12]

This interpretation is consonant with a reading of the other claims of the '465 patent. As both parties agree, claims 1–6 recite a module/chassis combination. Given the thorough description of a module/chassis combination in claim 1,[13] it is difficult to fathom why claims 7–10 would simply be more combination claims. Significantly, a patent is a contract; as such, it is subject to the same general rules of construction as other contracts. *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. (12 Otto) 222, 227, 26 L.Ed. 149 (1880); *Amgen, Inc. v. Chugai Pharm. Co., Ltd.,* 706 F.Supp. 94, 100 (D.Mass.1989). As a contract, the '465 patent would not make sense if claims 7–10 were combination claims.

Further, the language of claim 1, which the litigants agree is a combination claim, is strikingly different than the language of claim 7. Claim 1 recites:[14]

A telecommunications module, *comprising:*

a housing, including an opening at a forward wall of the housing;

*a plurality of removable cartridges containing telecommunications equipment and insertable into the housing,* wherein the cartridges slide into the housing through the opening, wherein each cartridge has a first and second side, said first side having a first cartridge guide of a first predetermined shape and said second side having a second cartridge guide of a second predetermined shape;

a cartridge supporting frame including a plurality of spaces for receiving the plurality of cartridges, said frames including first and second columns of said spaces, each of said first and second columns including first and second frame guides on opposite sides of said spaces, said first frame guide having a size and disposition so as to slidably mate with said first cartridge guide and said second frame guide having a size and disposition so as to slidably mate with said second cartridge guide;

·    ·    ·    ·    ·

D.I. 50 at Exh. A, pp. 8–9, col. 4–5, ln. 47–68, 1–10 (emphasis added). Claim 1 unequivocally includes both a module and a chassis. Claim 7, on the other hand, does not explicitly state it encompasses a chassis. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023 (Fed.Cir.1987); *see also Grain Processing Corp. v. American Maize–Prods. Co.,* 840 F.2d 902, 911 (Fed.Cir.1988) ("It is improper to read limitations of one claim into another."); *Black & Decker, Inc. v. Hoover Serv. Ctr.,* 765 F.Supp. 1129, 1135 (D.Conn. 1991) ("A court may not introduce into a claim by interpretation limitations that are explicitly contained in other claims."). In short, differences between claims 1 and 7 further compel the conclusion that claim 7 is not a combination claim.

### (B) Patent Specification

As rehearsed earlier, the Federal Circuit Court of Appeals has reasoned "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics,* 90 F.3d at 1582. The Federal Circuit has elaborated: "The specification acts as a dictionary when

---

**12.** At argument, counsel for ADC posited a helpful analogy for this point. Assume a patentee has invented a particular car radio with certain unique properties. The radio, of course, will not work unless fitted into a car. In the patent claims, the patentee may describe the car radio in large part by the environment in which it is placed—an automobile. Yet a copier of that car radio will not avoid infringement simply because he has not produced the automobile in conjunc-

tion with the radio; simply making the car radio will suffice.

**13.** Claim 1 of the '465 patent, like claim 7, is an independent claim, from which claims 2–6 are derived.

**14.** *See supra* notes 9–10.

it defines terms used in the claims or when it defines terms by implication.... [I]t is the single best guide to the meaning of a disputed term." *Id.* (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995) (en banc), *aff'd,* —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). This case is atypical, however, in that the parties have expressed no serious quibbles over the meaning of any terms used in the claim. Both sides agree, for example, on what a "module" is, as referenced in the '465 patent, and neither side is willing to contend that a "chassis" is anything but a particular structure, as defined by the '465 patent, which accepts particular modules, as defined by the '465 patent.[15] Rather, the confusion centers on the nature of claims 7–10, and the effect of the preamble to claim 7. Neither party has pointed to specific provisions in the patent specification as illuminative on whether claim 7 is a combination claim or a module-only claim. Resort to the patent specification, therefore, is unnecessary.

### (C) Prosecution History

■ Although each side characterizes the prosecution history of the patent as favorable to its interpretation, it slightly favors ADC. According to Siecor, when ADC proposed claims that related solely to cartridges, the Patent Examiner (the "Examiner") rejected them as unpatentable. Indeed, in vetoing the claims on September 21, 1993, the Examiner noted: "These claims are directed to the structure of the cartridge itself." D.I. 50 at Exh. A, p. 40. According to Siecor, after this denial by the Examiner, the inventors amended the claim to provide a two-column frame, in which the cartridge would be inverted, then fitted; only then was the claim approved.

But in the "Remarks" given to the Patent Office on March 21, 1994, after amendment of the claim and before approval, the prosecuting attorney wrote, "The present invention pertains to a novel construction of a fiber telecommunications cartridge *as well as* a combination of a cartridge and a module cabinet for holding a plurality of such car-

tridges." *Id.* at 50 (emphasis added). This comment is clearly in the disjunctive—the patent covered a lone module, as well as a module/chassis combination.

### 3. Extrinsic Evidence

■ Siecor has introduced extrinsic evidence that claims 7–10 are combination claims. Siecor presented a "Wall Mount Chassis" designed and produced by ADC. D.I. 51 at Exh. F, p. 21. The Wall Mount Chassis is a one-column chassis, yet the modules at issue here fit into it. Since there is only one column in the Wall Mount Chassis, a module cannot be inverted. Both parties agree that inversion is a defining characteristic of all of the claims. This demonstrates, argues Siecor, the ADC modules have applications where inversion is not required. Therefore, Siecor reasons, the invention heralded in claim 7 of the '465 patent must refer to a module/chassis combination.

Resort to the extrinsic evidence in this case would be improper, however. The Federal Circuit has counseled against evaluating extrinsic evidence when intrinsic evidence will suffice for construction of a claim. *Vitronics,* 90 F.3d at 1583; *Insituform Tech.,* 99 F.3d at 1106 n. 7. But even if this extrinsic evidence were given meaningful consideration, it would be unlikely to alter the Court's interpretation of claims 7–10 as directed solely at the module. The fact a component—in this case, the module—may have been used in a way that did not take advantage of its beneficial properties would not materially alter the analysis.

### 4. Conclusion

The Court concludes claims 7–10 are directed only to the module, not a chassis/module combination. Any other interpretation would render claims 7–10 surplusage and ignore the express language of the patent claims. Having construed claims 7–10 of the '465 patent, the Court now turns to the remaining substantive arguments advanced by Siecor in support of its motion for summary judgment.

---

**15.** As noted earlier, *see supra* note 1, while the parties seem to have had little trouble affixing meaning to the items in dispute, a jury might have a more arduous time pinpointing the shifty nomenclature to the chassis, module, and cartridge.

### E. The Notice and Marking Requirements of 35 U.S.C. § 287.

35 U.S.C. § 287, popularly called the "marking statute," imposes certain limits on the remedies a patentee may pursue for infringement of a patent. Under the marking statute, a patent holder cannot recover damages "except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice." 35 U.S.C. § 287(a). A patentee may notify an infringer of its infringement in either of two ways: (1) by giving constructive notice through marking substantially all of its patented products; or (2) by providing actual notice, in which case its damages will be limited to after the notice was given. *American Medical Sys., Inc. v. Medical Eng'ring Corp.*, 6 F.3d 1523, 1537–38 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994). ADC does not contend it gave actual notice to Siecor. Rather, ADC seeks to prove at trial that it marked substantially all of the products covered by the '465 patent.

Compliance with the marking requirements of § 287(a) is a question of fact, and the patentee has the burden of pleading and proving compliance at trial. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed.Cir), *cert. filed*, 65 U.S.L.W. 3416 (U.S. Nov. 25, 1996) (No. 96–851). Siecor argues ADC has not produced any credible evidence from which a rational jury could find that ADC complied with the marking requirements of the statute. Thus, according to Siecor, ADC's claim should be barred.

#### 1. Marking of the Module/Chassis Combination

■ ADC did not issue an Engineering Change Order ("ECO") directing the marking of the chassis portion of the patented combination until December 1995, just prior to institution of this litigation. D.I. 50 at Exh. B, pp. 14–16. ADC's failure to mark the chassis—a separately sold component of the patented combination—is fatal to its position here, argues Siecor; when it was designing its "clone," Siecor looked to the *combination* for a patent. Finding none, it concluded there was no patent on the product. Thus, Siecor argues, summary judgment is appropriate because ADC failed to comply with the marking statute.

This argument is predicated on the notion that all claims of the '465 patent are combination claims. Indeed, it is one of the justifications advanced by Siecor in urging the Court to engage in claim construction. Siecor has contended that every element of a patented combination must be marked to comply with the marking statute. The Court's interpretation of claims 7–10 of the '465 patent as module-only claims obviates the need to reach this issue. In its briefs, and at oral argument, ADC has steadfastly maintained it is seeking damages arising only from Siecor manufacturing and showing Sprint its module "clone".[16] *See* D.I. 54 at 7, n. 1. The RFQ asked for bids on modules as separate components. D.I. 55 at 146. ADC has disavowed any intention of claiming damages from the manufacture or demonstration of a chassis for Sprint. *Id.* Accordingly, since ADC is seeking damages only as a result of the module, ADC need only have marked the modules to recover for infringement.

#### 2. Marking of the Module

■ ADC issued an ECO on December 13, 1994, about one month after the issuance of the '465 patent. D.I. 55 at 132–40. The ECO modified the assembly drawings for ADC's patented modules. Note 6 to a diagram entitled "BASIC MODULE ASSEMBLY" commands ADC's production staff to "ATTACH ADC LABEL F/N 062 TO REAR PLATE F/N 830. INCLUDE 'U.S. PATENT NO. 5,363,465' ON LABEL" D.I. 55 at 136. This diagram, argues ADC, when considered along with its regular practice of manufacturing and delivering products in strict conformity with its own assembly drawings, is evidence of compliance with the marking requirements of the marking statute.

---

16. ADC wrote: "Because ADC did not suffer any damage from [Siecor]'s manufacture of the chassis, ADC has limited its damages claims solely to the modules." D.I. 54 at 7 n. 1.

ADC has presented further evidence that it has marked the modules in accordance with 35 U.S.C. § 287(a). ADC highlights the declarations of ADC customers; all uniformly aver the modules they received, from early 1995, were marked as claims of the '436 patent. D.I. 55 at 271–72, 275–76.

Finally, ADC admits it may have shipped unmarked patented products. But it explains that it started marking products shortly after the ECO was issued, and since the patented modules are made-to-order and not kept in stock, it would be extremely unlikely that unmarked products were shipped after the ECO was issued. When pieced together, ADC argues, these chunks of evidence form a gnostic whole: ADC was marking substantially all of its patented products and had ceased delivering unmarked products by January of 1995, more than eight months before Siecor allegedly infringed the '436 patent.

ADC has woven a threadbare quilt with swatches of evidence, Siecor argues, and when that quilt is scrutinized, its inferential stitches strain and fall apart, revealing it for the cheesecloth it truly is. Siecor attacks the ECO by stressing there is no direct evidence anyone complied with the ECO. Indeed, the witness ADC provided pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Jeffrey Korkowski, admitted he "personally couldn't confirm as an eye witness that they had been marked." D.I. 50 at Exh. B, p. 31. ADC responded by noting that although Korkowski had not actually witnessed the markings being placed on the modules, his review of documentation led him to believe most modules had been marked. D.I. 50 at Exh. B, p. 31.

Further, Siecor reads the ECO to order only one subclass of ADC's patented products—the so-called "splitter module"—marked. D.I. 55 at 136. According to Siecor, the ECO and the customer declarations do not cover products with different internal modular components—such as wave division multiplexing components ("WDM's") and fiber optic switch components modules ("OSDX's")—which are also covered by the '465 patent. Indeed, each drawing in the ECO has a title block pertaining to splitter modules. But as Rodney L. Christensen, the Director of Fiber Optic Engineering at ADC, points out, the ECO became effective for all VAMs. D.I. 62. According to Christensen, the "Documents Affected" section of the ECO indicates *all* products covered by the '465 patent are to be marked. D.I. 55 at 136. Siecor rebuts this with the flat assertion that each document listed in the "Documents Affected" section pertains to splitter modules. Given the respective positions of the parties, an issue of fact precludes a grant of summary judgment.

*Ceeco Machinery Manufacturing, Ltd. v. Intercole, Inc.,* 817 F.Supp. 979 (D.Mass. 1992), is also instructive. In *Ceeco,* there were cross-motions for summary judgment on whether the patentee had complied with the marking provisions of 35 U.S.C. § 287. *Id.* at 980. The *Ceeco* court, relying on testimony from the plaintiff corporation that it had a policy and regular practice of marking its patented products, as well as customer declarations that stated the products were always marked, found there was an issue of fact as to whether there was constructive notice in accordance with 35 U.S.C. § 287. *Id.* at 982–84. As the alleged infringer did in *Ceeco,* Siecor assails the customer declarations because the customers only inspected a sample of the modules they received, and neither customer explicitly stated he has personal knowledge of the subject matter of the declarations. But similar objections were made in *Ceeco;* as in *Ceeco,* such exploitation of evidentiary weakness should be made to the factfinder, not the Court on summary judgment.[17]

## F. Willful Infringement

█ ADC must prove willful infringement by clear and convincing evidence. *Gustaf-*

---

17. The string of cases Siecor cites in support of summary judgment on this point are inapposite. In many of the cases, the patentee did not assert it had marked its patented products, *see e.g., Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.,* 906 F.Supp. 813, 817 (E.D.N.Y.1995) ("[Patent owner] does not contend that it ever marked or required marking of a patented product."), and one case quoted by Siecor dealt with the difficulty of proving *actual notice, Lemelson v. Fisher Price Corp.,* 545 F.Supp. 973, 975 (S.D.N.Y. 1982).

*son, Inc. v. Intersys. Indus. Prods., Inc.,* 897 F.2d 508, 510 (Fed.Cir.1990). Willfulness is a question of fact. *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1221 (Fed. Cir.1995). It includes elements of intent, reasonableness, and belief. *Id.* Willful infringement requires a certain level of scienter by the alleged infringer; the alleged infringer must act "in disregard of the patent" and have "no reasonable basis for believing it had a right to do the acts." *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1565 (Fed.Cir. 1983). Siecor argues there is no evidence that it had knowledge of the '465 patent prior to receipt of the letter from Graybar; thus, before then, it could not have possessed the requisite level of scienter for willful infringement.

ADC, on the other hand, asserts there is ample evidence in the record to support a factfinder's conclusion that Siecor had knowledge of the '465 patent prior to the design and manufacture of its "clone." In early July of 1992, Siecor produced a monthly "Competitor Profile" of ADC. D.I. 55 at 249–50. Siecor summarized various information about the goings-on at ADC; one subheading contained a brief report of the patents issued to ADC. *Id.* In fact, the November 1994 "Computer Profile" reported the issuance of a "Fiber Optic Connector Module" patent to ADC on November 8, 1994. D.I. 55 at 251–52. This is the title and issuance date of the '465 patent. *See* D.I. 55 at 105.

Further, in internal memoranda written approximately nine months after the issuance of the '465 patent, Siecor repeatedly referred to its module as an ADC "clone." *See* D.I. 55 at 141. In an August 2, 1995 memorandum, a Siecor product manager chided his sales manager for using the phrase "ADC clones" because of "some patent issues with ADC." D.I. 55 at 253. In a memorandum meant as a reply to the sales manager's bewildered questions over the "patent issues with ADC", the product manager wrote "I thought I had mentioned the new ADC patent to you some time ago.... At any rate, sorry if I didn't." D.I. 55 at 254. These documents, argues ADC, clearly show that managers at Siecor were well aware of the '465 patent issued to

ADC, and the fact that it covered new modules.

Siecor does its best to undermine the efficacy of these memoranda. First, Siecor notes the "Competitive Report" was prepared by the Siecor librarian, Ms. Sain, and Ms. Sain did not have access to a copy of the '465 patent. D.I. 57 at Exh. S. Further, Siecor argues, "there is no evidence that her knowledge was conveyed to those persons at Siecor who were in a position to act upon it— *i.e.,* the managers at Siecor who designed and built the prototypes of modules." D.I. 49 at 24. In her affidavit, Ms. Sain explains she sent the Competitor Profile reports to Tony Tripeny, David McCaughan, Lois Boynton, and Mike Barrett, all of Siecor. D.I. 57 at Exh. S. Nowhere does Siecor explain who these individuals are, or what their job descriptions are. In fact, ADC has observed that Mr. Tripeny is Siecor's Corporate Controller. Further, Paul Hawkins, Siecor's Marketing Manager, stated he "may have seen" the profiles. D.I. 55 at 62. Thus, although it has certainly weakened the inference, Siecor has not dispelled the possibility a reasonable factfinder might infer knowledge of the '465 patent from the November 1994 Competitive Report.

Siecor also points to the subsequent testimony of Hawkins, who was a recipient of the August 1995 memoranda. According to Hawkins, the "new ADC patent" referred to in the memoranda concerned an unrelated ADC patent. D.I. 51 at Exh. L, p. 101. While this testimony seriously undermines ADC's inferences with regard to the August 1995 memoranda, it still involves an evaluation of credibility that is properly left to the finder of fact.

In sum, a factfinder could reasonably infer two different scenarios from the evidence and find willful infringement. First, ADC highlights the fact that Siecor based the module it offered for sale to Sprint on an ADC module. The module first produced by Siecor was virtually identical to the ADC patented module; indeed, Siecor called it an ADC "clone." If a factfinder concludes that ADC had already begun marking its module (a conclusion Siecor hotly disputes), then that same factfinder could make a reasonable inference that Siecor had a marked ADC mo-

dule in its possession prior to its alleged infringing acts. Siecor counters vehemently by noting there is no admission by any Siecor personnel that the ADC module it had was marked. This, too, is possible, since the ADC module Siecor possessed may have been manufactured before the '465 patent issued.

Nevertheless, ADC points to evidence Siecor learned of the '465 patent between the issuance of the patent and Siecor's bid to Sprint. Siecor knew it had an ADC sample module; in fact, it concedes it had an unmarked one. If it subsequently learned of the issuance of an ADC patent covering a module (possibly through Ms. Sain or others), a fact-finder could adduce that Siecor, in turn, made a reasonable inference of its own. The reasonable inference: the patent covered the ADC module Siecor had in its possession.

The law imposes an affirmative duty of care on Siecor to avoid infringement. *Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir. 1994). As rehearsed above, a factfinder could reasonably find Siecor directly copied ADC's patented modules thereby infringing the '465 patent. Siecor's motion for summary judgment as to ADC's claim of willful infringement will be denied.